# United States Court of Appeals
## For the First Circuit

No. 19-1894

IN RE MONTREAL, MAINE & ATLANTIC RAILWAY, LTD.,

Debtor.

———————————

WHEELING & LAKE ERIE RAILWAY COMPANY,

Appellant,

v.

ROBERT J. KEACH, in his capacity as Estate Representative for
MONTREAL, MAINE & ATLANTIC RAILWAY, LTD.,

Appellee.

———————————

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. Jon D. Levy, U.S. District Judge]
[Hon. Peter G. Cary, U.S. Bankruptcy Judge]

———————————

Before

Howard, Chief Judge,
Selya and Lynch, Circuit Judges.

———————————

George J. Marcus and Daniel L. Rosenthal, with whom
Marcus|Clegg was on brief, for appellant.
Adam R. Prescott, with whom Robert J. Keach, Letson B.
Douglass, and Bernstein, Shur, Sawyer & Nelson, P.A. were on brief,
for appellee.

April 9, 2020

**SELYA**, **Circuit Judge**.  On the surface, this appeal poses intricate questions concerning such esoteric areas of the law as secured transactions, carriage of goods, and corporate reorganization.  Digging deeper, though, the appeal turns on abecedarian principles relating to the allocation of the burden of proof and the deference due to the finder of fact.  After application of these principles in light of the record and the decisions of the courts below, we affirm the entry of judgment in favor of appellee Robert J. Keach, the estate representative of Montreal, Maine & Atlantic Railway, Ltd. (MMA), and against creditor-appellant Wheeling & Lake Erie Railway Company (Wheeling).

## I. BACKGROUND

This case is a by-product of litigation spawned by the tragic derailment of an MMA freight train carrying crude oil in Lac-Mégantic, Québec.  The derailment, coupled with MMA's subsequent bankruptcy filings (both in the United States and in Canada), has led to protracted dueling between Wheeling and Keach.[1]  See, e.g., Keach v. Wheeling & Lake Erie Ry. Co. (In re Montreal, Me. & Atl. Ry., Ltd.), 888 F.3d 1 (1st Cir. 2018); Wheeling & Lake

---

[1] Keach served as the Chapter 11 trustee for MMA's bankruptcy proceeding until the effective date of the plan of liquidation, see 11 U.S.C. § 1163, at which point he became the representative of the estate.  For ease in exposition, we refer to him throughout as the estate representative.

Erie Ry. Co. v. Keach (In re Montreal, Me. & Atl. Ry., Ltd.), 799 F.3d 1 (1st Cir. 2015). We assume the reader's familiarity with these two prior opinions and rehearse only the discrete set of facts needed to place this appeal into a workable perspective.

In June of 2009, Wheeling extended a $6 million line of credit to MMA, evidenced by a promissory note. In connection with this note, MMA executed and delivered a security agreement to Wheeling. The security agreement gave Wheeling an enforceable security interest in MMA's "Accounts and other rights to payment (including Payment Intangibles)," which extended to any non-tort claims accrued by MMA.[2] Wheeling perfected its security interest by filing a UCC-1 financing statement with the Delaware Secretary of State.

Four years later, Western Petroleum Company and certain corporate affiliates (collectively, the Shipper) arranged for the transport of seventy-two tank cars of crude oil with Canadian Pacific Railway Company (Canadian Pacific). Pursuant to the through bill of lading, Canadian Pacific and its American affiliate transported the oil from its point of origin in New Town, North

---

[2] Under the Maine Uniform Commercial Code, which governs the interpretation of the security agreement, commercial tort claims are excluded from the definition of payment intangibles. See Me. Stat. tit. 11, § 9-1102(61) (defining payment intangible as "a general intangible under which the account debtor's principal obligation is a monetary obligation"); id. § 9-1102(42) (defining general intangible as including "things in action" but not "commercial tort claims").

Dakota, to Québec, Canada, and transferred the shipment to MMA for carriage to its final destination in New Brunswick, Canada.

A noted Scottish poet famously wrote that "[t]he best-laid schemes o' [m]ice an' [m]en [g]ang aft a-gley." Robert Burns, To a Mouse (1785). So it was here: the shipment never reached its destination. On July 6, 2013, the MMA freight train carrying the oil derailed in Lac-Mégantic, Québec, sparking massive explosions that destroyed part of the town and killed nearly fifty people.

The derailment triggered a frenzy of litigation in U.S. and Canadian courts against MMA, the Shipper, and others involved in arranging and transporting the crude oil shipment. Several victims of the explosions, or family members on their behalf, sought damages for personal injury or wrongful death in state court in Illinois. A group of victims filed a class action lawsuit in Québec on behalf of all residents, property owners, and business owners in Lac-Mégantic affected by the derailment. The government of Québec began administrative proceedings to recover for environmental damage and clean-up costs.

In August of 2013 — one month after the derailment — MMA filed a voluntary petition for protection under Chapter 11 of the Bankruptcy Code, see 11 U.S.C. § 301, as well as an ancillary insolvency proceeding in Québec. Soon thereafter, Wheeling instituted an adversary proceeding in the bankruptcy court against

MMA and the estate representative, seeking to protect its rights under the security agreement. Pertinently, Wheeling sought a declaratory judgment regarding the existence and priority of its security interest in certain property of the MMA estate (the estate).

Recognizing the possibility that the estate would face significant liability arising out of the derailment, the estate representative began pursuing litigation against several entities involved in the crude oil shipment with the aim of establishing a fund for the derailment victims. As relevant here, the estate representative commenced an adversary proceeding against the Shipper in January of 2014. His complaint alleged that the Shipper negligently mislabeled the crude oil as less volatile than it actually was, causing MMA not to take the necessary precautions for handling a hazardous shipment. The complaint did not allege any contract or regulatory claims against the Shipper. In order to facilitate settlement discussions, the parties agreed that the Shipper would not assert counterclaims against the estate (but the Shipper reserved the right to do so if those discussions failed).

After extensive negotiations, the Shipper and the estate representative reached a settlement. The Shipper agreed to pay $110 million to the monitor in the Canadian bankruptcy case (for the ultimate benefit of the derailment victims), and the Shipper

and the estate representative agreed to release all claims and counterclaims against each other arising out of the derailment.

There were other terms as well. For one thing, the Shipper committed to assigning to the estate representative its Carmack Amendment claims against the non-MMA carriers involved in transporting the crude oil.[3] For another thing, the settlement was to become effective only upon the confirmation of the proposed plans in both the U.S. and Canadian bankruptcy proceedings (including the entry of orders barring all persons and entities from pursuing derailment-related claims against the Shipper). Striving to achieve global closure, the estate representative executed similar settlement agreements around the same time with many other entities.

When the estate representative presented the settlement agreements and his plan of liquidation to the bankruptcy court for approval and confirmation, Wheeling objected. It complained that the estate representative had agreed to release non-tort claims that the estate possessed against the Shipper as part of the

---

[3] The Carmack Amendment imposes liability on any rail carrier that receives or delivers a shipment for damage that occurs to the property during the rail route, regardless of which carrier caused the damage. See 49 U.S.C. § 11706(a). The purpose of the Carmack Amendment "is to relieve cargo owners 'of the burden of searching out a particular negligent carrier from among the often numerous carriers handling an interstate shipment of goods.'" Kawasaki Kisen Kaisha Ltd. v. Regal-Beloit Corp., 561 U.S. 89, 98 (2010) (quoting Reider v. Thompson, 339 U.S. 113, 119 (1950)).

- 7 -

settlement — even though the estate representative had not asserted any such claims in the adversary proceeding — and that those released non-tort claims constituted a part of Wheeling's collateral. Wheeling posited that the bankruptcy court's approval of the settlement and confirmation of the plan would deprive it of compensation for the estate representative's use of its collateral to secure the settlement with the Shipper, despite the fact that the plan classified its secured claim as unimpaired.

Notwithstanding Wheeling's objection, the bankruptcy court approved the settlement agreements and confirmed the estate representative's plan of liquidation. See id. §§ 1129, 1173. To address Wheeling's plaint, Paragraph 84 of the confirmation order stated that neither the order nor the settlement agreements "limit[ed] or affect[ed] Wheeling's ability to contend, and the [estate representative's] ability to contest, that Wheeling's security interest, if any, attaches to the Settlement Payments (whether as original collateral, proceeds, products or otherwise)." The confirmation order contained the injunctions against the prosecution of derailment-related claims necessary to render the settlement agreements effective.

While the estate representative was resolving the main bankruptcy proceeding, he was simultaneously engaged in litigation with Wheeling. After addressing other matters not relevant here, the adversary proceeding between Wheeling and the estate

representative reduced to the same issue that prompted Wheeling's objection to confirmation of the plan of liquidation: whether it was entitled to compensation for the release of non-tort claims that the estate possessed against the Shipper. In May of 2018, the bankruptcy court held a two-day bench trial relative to this issue. Wheeling and the estate representative agreed that the following stipulation should become part of the trial record:

> 1.  The derailment of the freight train carrying crude oil on July 6, 2013, in Lac-Mégantic, Quebec (the "Derailment") caused MMA to suffer economic damages as a result of the loss in value of its business, and other economic damages, in an amount no less than $25,000,000.
>
> 2.  Assuming (without admitting) that such claims existed, the Estate Representative would have incurred legal fees and costs in an amount no less than $825,000 but not greater than an amount that would cause the net economic damages referred to above, after deducting legal fees and costs, to be less than $10,000,000, had he pursued civil breach of contract claims directly against the shipper of the crude oil transported on the freight train involved in the Derailment, including attorneys' fees, litigation costs, expert fees, and the cost of defending against any and all counterclaims.

In a bench decision, the bankruptcy court ruled in favor of the estate representative on two alternative grounds. First, the court held that the estate representative did not use Wheeling's collateral when he agreed to a release as part of the settlement agreement because the estate did not have any cognizable

non-tort claims against the Shipper.  Second, the court found that, even if the estate possessed such claims, Wheeling had not carried its burden of proving their value.

Wheeling appealed to the district court.  That court determined that the estate did have non-tort claims against the Shipper (which the estate representative released as part of the settlement) but that the bankruptcy court was correct in concluding that Wheeling had not proven that those claims had any value.  See Wheeling & Lake Erie Ry. Co. v. Keach, 606 B.R. 1, 12, 14-15 (D. Me. 2019).  This timely appeal ensued.

## II. ANALYSIS

Appeals in bankruptcy cases proceed by means of a two-tiered framework.  See Privitera v. Curran (In re Curran), 855 F.3d 19, 24 (1st Cir. 2017).  The losing party in the bankruptcy court may take a first-tier appeal either to the district court or to the bankruptcy appellate panel.  See 28 U.S.C. § 158(a)-(b); In re Curran, 855 F.3d at 24.  Whichever route is taken, a second tier of appellate review is available in the court of appeals. See 28 U.S.C. § 158(d)(1); In re Curran, 855 F.3d at 24.  At that stage, we accord no particular deference to determinations made by the first-tier appellate tribunal but, rather, focus exclusively on the bankruptcy court's determinations.  See In re Curran, 855 F.3d at 24.  In the course of that endeavor, we review the bankruptcy court's findings of fact for clear error and its legal

conclusions de novo.  See Berliner v. Pappalardo (In re Puffer), 674 F.3d 78, 81 (1st Cir. 2012).  Under the clear error standard, we defer to the bankruptcy court's factual findings "unless, on the whole of the record, we form a strong, unyielding belief that a mistake has been made."  Gannett v. Carp (In re Carp), 340 F.3d 15, 22 (1st Cir. 2003) (quoting Cumpiano v. Banco Santander P.R., 902 F.2d 148, 152 (1st Cir. 1990)).

## A. **Framing the Issue**.

Wheeling challenges both of the grounds supporting the bankruptcy court's entry of judgment in favor of the estate representative.  According to Wheeling, the bankruptcy court erred in concluding that the estate representative did not use its collateral when he agreed to the release as part of the settlement with the Shipper.  In its view, the estate possessed contract and regulatory claims against the Shipper based on indemnification obligations under both the through bill of lading issued by Canadian Pacific and the uniform bill of lading applicable to rail shipments pursuant to 49 C.F.R. § 1035.1.  Given the estate representative's use of these non-tort claims to secure a settlement of significant value to the estate, Wheeling's thesis runs, the court erred as well in finding that Wheeling failed to prove the value of these claims.

The parties wrangle over a host of complex legal issues in the course of expounding their respective views on the merits

- 11 -

of the bankruptcy court's ukase. Many of these issues raise questions of first impression in this circuit — questions about matters ranging from the carriage of goods to secured transactions. We are mindful, however, that "courts should not rush to decide unsettled issues when the exigencies of a particular case do not require such definitive measures." In re Curran, 855 F.3d at 22. Because we discern no clear error in the bankruptcy court's finding that Wheeling failed to carry its burden of proving the value of the non-tort claims, we need not resolve the rest of the complex legal issues raised by the parties. We explain briefly why we are able to skirt those questions.

The parties' debate over whether the estate possessed cognizable non-tort claims against the Shipper reduces to the following question of law: can a connecting carrier sue a shipper to enforce the terms of either a through bill of lading issued by the originating carrier or the uniform bill of lading for rail shipments under federal law? Relying largely on the Supreme Court's decision in Southern Pacific Transportation Co. v. Commercial Metals Co., 456 U.S. 336 (1982), Wheeling contends that a connecting carrier has a contractual relationship with a shipper governed by the terms of the through bill of lading. See id. at 342 (stating that bill of lading's "terms and conditions bind the shipper and all connecting carriers" (citing Tex. & Pac. Ry. Co. v. Leatherwood, 250 U.S. 478, 481 (1919))). The estate

- 12 -

representative responds that the Supreme Court has characterized connecting carriers as "mere agents" of the originating carrier with no independent contractual rights vis-à-vis the shipper. E.g., Mo., Kan. & Tex. Ry. Co. of Tex. v. Ward, 244 U.S. 383, 387-88 (1917).

We need not answer this arcane and unsettled question about the relationship between a shipper and a connecting carrier. In order to prevail in this appeal, Wheeling must show that the bankruptcy court erred in finding both that the estate did not possess any non-tort claims against the Shipper and that Wheeling failed to prove the value of those claims. See 11 U.S.C. § 506(a)(1) ("An allowed claim of a creditor secured by a lien on property in which the estate has an interest . . . is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property . . . ."). Since we uphold the bankruptcy court's finding on the latter question, determining whether the estate possessed any non-tort claims against the Shipper would be wholly gratuitous. We therefore assume — solely for purposes of this appeal — that the estate did possess such non-tort claims and that those claims constituted a part of Wheeling's collateral.

Next, the parties vehemently disagree about the source of Wheeling's entitlement to compensation for the estate representative's use of the non-tort claims. Wheeling asserts

that this entitlement arises from the Bankruptcy Code's guarantee of adequate protection to compensate an entity with an interest in property that is used by the trustee. See id. § 363(e). The estate representative counters that adequate protection is available only before plan confirmation and that Wheeling's entitlement to compensation derives instead from Paragraph 84 of the confirmation order (which protected Wheeling's right to assert that its security interest attached to the Shipper's settlement payment).

The parties' agreement on certain aspects of the valuation inquiry absolves us of any need to explore this shadowy corner of bankruptcy law. Whatever the source of Wheeling's entitlement to compensation, the parties concur that Wheeling bore the burden of proof before the bankruptcy court to demonstrate the value of the non-tort claims (or at least that the claims were worth more than the amount of Wheeling's secured claim). What is more, they agree that 11 U.S.C. § 506(a)(1) supplies the applicable standard for valuing those claims. In light of our conclusion that the bankruptcy court did not clearly err in finding that Wheeling failed to carry this burden, choosing between the two possible sources of Wheeling's entitlement to compensation (adequate protection and plan confirmation) would be an empty exercise.

The short of it is that we assume, without deciding, that the estate possessed cognizable non-tort claims against the Shipper, which constituted a part of Wheeling's collateral. We also assume, again without deciding, that the estate representative released those non-tort claims as part of the settlement with the Shipper.

These assumptions tee up the work that remains. To merit compensation for the estate representative's use of its collateral, Wheeling bore the burden of demonstrating the value of the released claims pursuant to section 506(a)(1). The bankruptcy court found that Wheeling had failed to carry this burden, and we now shift the lens of our inquiry to Wheeling's challenge to that finding.

## B. **Valuation of Collateral**.

The bankruptcy court formulated two reasons for its holding that Wheeling did not carry its burden of demonstrating the value of the non-tort claims: Wheeling had neither adduced "evidence identifying specific settlement value" of the claims nor proven that they "had any positive net value" in relation to Carmack Amendment counterclaims that the Shipper held against the estate. Wheeling attacks this two-pronged holding, arguing that both of its branches resulted from a series of legal errors. To begin, it contends that the bankruptcy court should not have required a showing that the non-tort claims were more valuable

than the Shipper's hypothetical counterclaims. Relatedly, it assigns error to the bankruptcy court's consideration of what it views as expert testimony proffered by the estate representative. It also assails the court's imposition of a tracing requirement, which took into account that the Shipper's settlement payment was earmarked for compensation for derailment victims.

Taking these arguments as a group, Wheeling says, in effect, that the bankruptcy court impermissibly constructed an insurmountable set of obstacles, which hamstrung its ability to prove its entitlement to compensation for the estate representative's use of the non-tort claims. But as previously noted, Wheeling concedes that it had the burden of attributing some value to the non-tort claims under section 506(a)(1). We therefore start our analysis with the question of whether Wheeling carried this burden. If it did not, the propriety of the additional requirements that the bankruptcy court imposed becomes a matter of purely academic interest (and, thus, poses questions that we need not decide).

Section 506(a)(1) directs a bankruptcy court to determine the value of property in which a creditor has a secured interest "in light of the . . . disposition or use of such property." Id. § 506(a)(1). The secured creditor must demonstrate this value by a preponderance of the evidence. See Prudential Ins. Co. of Am. v. SW Bos. Hotel Venture, LLC (In re SW Bos. Hotel

- 16 -

Venture, LLC), 748 F.3d 393, 408-09 (1st Cir. 2014).  We assume, for argument's sake, that the estate representative used some of Wheeling's collateral when he released the non-tort claims as part of the settlement with the Shipper.  Hence, Wheeling bore the burden of showing the settlement value of the non-tort claims, that is, their value as a bargaining chip to secure a settlement with the Shipper.  We further assume — again for argument's sake — that neither the valuation attributed to the non-tort claims by the settling parties nor the value of the consideration that the estate representative actually received in exchange for their release was conclusive on the question of their settlement value.  In other words, we assume (favorably to Wheeling) that Wheeling could have satisfied its burden by offering evidence of the claims' settlement value, independent of the actual settlement that the parties reached.[4]

As we read the record, the bankruptcy court applied this valuation standard when it concluded that Wheeling "failed to establish evidence identifying specific settlement value" of the

---

[4]  By defining Wheeling's burden of proof in this straightforward manner, we honor its argument that it is entitled to compensation for the estate representative's use of the non-tort claims "however one might assess or value what the Estate got in exchange" — an argument that relates to its belief that this is a matter of adequate protection and not a matter of plan confirmation.  We use the term "settlement value" only to make clear that, as the parties agree, Wheeling had to show the value of the claims as a bargaining chip in the settlement with the Shipper, not, say, their value on the open market.

non-tort claims. The court appears to have reached this conclusion based on Wheeling's failure to present any probative evidence at all, not on the estate representative's testimony either that the Shipper held valuable counterclaims against the estate or that the settling parties did not attribute any specific value to the non-tort claims.[5] Because the court applied Wheeling's proposed valuation standard in fashioning this finding, we review the finding (that Wheeling failed to present sufficient evidence to carry its burden of showing the settlement value of the non-tort claims) for clear error. See id. at 404 (reviewing finding as to when secured creditor became oversecured under section 506 for clear error); cf. United States v. One Star Class Sloop Sailboat Built in 1930 with Hull No. 721, Named "Flash II", 546 F.3d 26, 35 (1st Cir. 2008) (same for finding as to fair market value for civil forfeiture).

Wheeling's challenge to this finding centers on the stipulation that the parties submitted to the bankruptcy court. According to the stipulation, the derailment caused MMA to suffer at least $25 million in economic damages, and the amount of MMA's

---

[5] When the district court denied Wheeling's motion to stay the judgment of the bankruptcy court, it too treated the bankruptcy court's first rationale for ruling against Wheeling on the valuation issue as reliant on a failure of proof, not on any aspect of the estate representative's testimony. See Wheeling & Lake Erie Ry. Co. v. Keach, No. 1:18-cv-00262-JDL, 2018 WL 4696457, at *2 (D. Me. Oct. 1, 2018).

"net economic damages" (economic damages minus legal fees and costs) for the non-tort claims was at least $10 million. Wheeling contends that the bankruptcy court clearly erred in rejecting this stipulation as alone sufficient to prove that the value of the non-tort claims was not less than this $10 million figure, which is higher than the amount of Wheeling's secured claim.[6]

This contention relies on the erroneous premise that the value of a claim is the amount of damages suffered by the claimant, net of prosecution costs. Valuing a claim, at least for settlement purposes, is not so simple. See Polis v. Getaways, Inc. (In re Polis), 217 F.3d 899, 903 (7th Cir. 2000) ("A claim for $X is not worth $X." (emphasis in original)); cf. Limone v. United States, 579 F.3d 79, 104 (1st Cir. 2009) ("[I]t is unrealistic to assume that settlement values . . . equate to actual damages."). At its most elementary, the settlement value of a claim is the amount that the claimant would recover if he prevails in litigating the claim multiplied by the probability of recovery. See In re Polis, 217 F.3d at 902. In turn, the probability of recovery depends on a gallimaufry of factors, such as the strength of the claimant's evidence, the viability of any defenses, and the ability of the defendant to satisfy a judgment. See United States v. Safety Car

_____

[6] On the day that MMA filed its Chapter 11 petition, Wheeling had advanced it the full $6 million available under the line of credit. Various post-petition collections have reduced the outstanding principal balance to $3,421,443.33.

Heating & Lighting Co., 297 U.S. 88, 100 (1936) (explaining that value of patent infringement claim was uncertain because "[t]he patent might be adjudged invalid" or "[t]he infringer might become insolvent"). Many other considerations, including the cost of litigation, the staying power of the parties, their relative desire to avoid litigation, and their bargaining leverage, also may inform the settlement value of a claim. See Ernst & Young v. Depositors Econ. Prot. Corp., 45 F.3d 530, 540 (1st Cir. 1995). As such, even a claim alleging a substantial figure for damages may have no settlement value at all if the cost, difficulty, or uncertainty of litigation makes it not worthwhile to pursue.

The stipulation's damages estimate of at least $25 million measures only the estate representative's potential recovery if he successfully litigated the non-tort claims against the Shipper; it does not take into account the cost of litigation or the odds that the estate representative actually would have recovered this sum (or any sum, for that matter) had he litigated the non-tort claims instead of settling them. In the highly ramified circumstances of this case, such a recovery was far from certain. For instance, the Shipper faced the real possibility of significant tort liability to victims of the derailment because of its apparent mislabeling of the crude oil. If, in the absence of a global settlement, both the estate representative and the derailment victims had successfully pursued their respective

- 20 -

claims, the Shipper may well have had insufficient assets to satisfy all the monetary judgments.

The stipulation's second figure — its "net economic damages" estimate of at least $10 million — added nothing of consequence to Wheeling's attempt to carry its burden of proof. Importantly, the stipulation does not say that this figure is an estimate of the estate representative's expected recovery. Thus, although this figure factors in the costs that the estate representative would have incurred had he litigated the non-tort claims, it still fails to account for the likelihood (or lack of likelihood) that the estate representative would have secured such a recovery. Wheeling offered no evidence that would have allowed the bankruptcy court either to assess this likelihood or to gauge any of the relevant factors other than the estate's potential recovery that may have affected the settlement value of the non-tort claims. Given this paucity of proof, we conclude that the bankruptcy court did not clearly err in holding that Wheeling failed to carry its burden of offering some probative evidence, over and beyond the stipulation, showing the settlement value of the non-tort claims.

Wheeling resists this conclusion. In defense of its reliance on the "net economic damages" figure, it points out that a plaintiff's potential recovery serves as the "value" of a claim in other contexts. For example, courts use a version of this

- 21 -

metric to determine whether a claim meets the amount-in-controversy requirement for federal diversity jurisdiction, see, e.g., Barrett v. Lombardi, 239 F.3d 23, 30-31 (1st Cir. 2001), and to calculate damages when attorney malpractice results in the loss of a claim, see, e.g., Black v. Shultz, 530 F.3d 702, 709-10 (8th Cir. 2008). But as Wheeling concedes, it bore the burden of valuing the non-tort claims in the idiosyncratic context of the settlement between the estate representative and the Shipper. The measures used to "value" claims in other (inapposite) contexts furnish little guidance as to whether the bankruptcy court clearly erred in rejecting the estate representative's potential recovery as the settlement value of the non-tort claims.

Wheeling has another weapon in its armamentarium. It strives to persuade us that the non-tort claims must have significant value because the estate representative released them in exchange for the Shipper's payment of $110 million, the discharge of Carmack Amendment counterclaims against MMA, and the assignment of Carmack Amendment claims against other carriers to the estate. We are not convinced.

Wheeling's argument vastly oversimplifies the exchange and completely ignores the other items of value that the Shipper received as part of the settlement. For one thing, the estate representative released not just the hypothetical non-tort claims but also the negligence claim that he had asserted against the

Shipper in the adversary proceeding complaint — a claim that presumably had some value for settlement purposes. For another thing, the settlement only became effective upon confirmation of the plans in both the U.S. and Canadian bankruptcy proceedings, including the entry of orders barring all derailment-related claims against the Shipper. Such orders obviously were of significant value to the Shipper. After all, multiple derailment victims already had sued the Shipper, and the Shipper's mislabeling of the crude oil appears likely to have contributed to the carnage engendered by the derailment.

Last — but surely not least — the Shipper secured peace of mind knowing that it would not face further liability arising out of the derailment. A defendant seeking such a global settlement would naturally seek to obtain a release of all claims, not just the ones that seem to have apparent value. Almost always, a main goal of a global settlement is to leave no loose ends.

To say more on this point would be supererogatory. The bottom line is that because the Shipper received much more than just the release of the non-tort claims in the settlement, we cannot fault the bankruptcy court for declining to find that the fact of the settlement alone comprised sufficient evidence of the value of those claims.

We add a coda. Even if the settlement proved that the non-tort claims had some value — and it did not — Wheeling still

would have had to demonstrate what that value was (or at least that the value exceeded the amount of its secured claim). That the settlement agreement included the release of these claims does not, without more, tell us anything about their specific value. To show the required value, Wheeling offered nothing more than the stipulation of "net economic damages." But for the reasons previously discussed, the bankruptcy court did not clearly err in rejecting this stipulation as sufficient proof of the settlement value of the non-tort claims.

Finally, Wheeling makes a policy argument. It submits that an affirmance of the bankruptcy court's valuation finding will encourage estate representatives to use the difficult-to-value collateral of secured creditors for the benefit of unsecured creditors without paying any compensation for such use. This concern, though, is overblown. Our affirmance of the bankruptcy court's finding is not based on the failure of the estate representative and the Shipper to allocate a specific value to the non-tort claims as part of the settlement; instead, it is based on Wheeling's failure to carry its burden of proof.

And although a cause of action may be a difficult asset to value, we do not agree with Wheeling's suggestion that it had no means, other than the stipulation of "net economic damages," for showing the settlement value of the non-tort claims. For instance, an expert witness could have analyzed the range of

factors that may have affected the settlement value of the non-tort claims and given expert opinion testimony as to that value before the bankruptcy court. That Wheeling instead chose to rely on a plainly insufficient stipulation of "net economic damages" does not mean that valuing the non-tort claims was impossible.

To sum up, the principal evidence that Wheeling presented to the bankruptcy court to satisfy its burden of demonstrating the settlement value of the estate's non-tort claims against the Shipper was the parties' stipulation that the amount of MMA's "net economic damages" (economic damages minus prosecution costs) was no less than $10 million. Because the settlement value of a claim may depend on other factors, though, the bankruptcy court's finding that Wheeling did not carry its burden of proof was not clearly erroneous. This finding, in turn, is sufficient to permit the resolution of this appeal, and we take no position on whether Wheeling's entitlement to compensation depended on its ability either to make an additional showing that the non-tort claims had positive net value in relation to the Shipper's Carmack Amendment counterclaims or to trace its collateral to identifiable proceeds. So, too, we have no occasion to decide whether the bankruptcy court properly considered the estate representative's testimony about those counterclaims.

## III. CONCLUSION

We need go no further. The phrase "burden of proof" is not merely a rhetorical flourish. It signifies that the party to whom the burden is assigned must offer evidence, either direct or circumstantial, sufficient to persuade the factfinder of some fact or proposition to a certain quantum of proof (here, a preponderance of the evidence). The factfinder's judgment as to whether that party has offered evidence adequate to carry this burden should not readily be disturbed. This is such a case: giving due deference to the factfinder's resolution of the burden-of-proof issue, the judgment of the district court must be

**Affirmed**.