# United States Court of Appeals
## For the First Circuit

No. 17-1108

IN RE: LAC-MÉGANTIC TRAIN DERAILMENT LITIGATION

ANNICK ROY, as special administrator of the estate of Jean-Guy
Veilleux, deceased, individually and as next friend of minor,
F.R.V., ET AL.,

Plaintiffs, Appellants,

v.

CANADIAN PACIFIC RAILWAY COMPANY,

Defendant, Appellee,

SOO LINE RAILROAD COMPANY, d/b/a Canadian Pacific Railway;
DELAWARE AND HUDSON RAILROAD COMPANY INC., d/b/a Canadian
Pacific Railway; DAKOTA MINNESOTA AND EASTERN RAILROAD
CORPORATION, d/b/a Canadian Pacific Railway; and CANADIAN
PACIFIC RAILWAY LIMITED,

Putative Defendants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. Jon D. Levy, U.S. District Judge]

Before

Lynch and Selya, Circuit Judges,
and Katzmann,* Judge.

_____

    * Of the United States Court of International Trade, sitting
by designation.

Matthew W.H. Wessler, with whom Gregory A. Beck, Larkin Turner, Gupta Wessler PLLC, Ted A. Meyers, Peter J. Flowers, Craig D. Brown, Meyers & Flowers LLC, Jason C. Webster, The Webster Law Firm, Mitchell A. Toups, and Weller, Green, Toups & Terrell, LLP were on brief, for appellants.

Paul J. Hemming, with whom Leah Ceee O. Boomsma, Taft Stettinius & Hollister LLP, Mark F. Rosenberg, and Sullivan & Cromwell LLP were on brief, for appellee.

June 2, 2021

**SELYA**, **Circuit Judge**. This appeal requires us to decide, as a matter of first impression in this circuit, whether the Federal Rules of Bankruptcy Procedure (the Bankruptcy Rules) or the Federal Rules of Civil Procedure (the Civil Rules) govern cases that have come within the federal district court's jurisdiction as cases "related to" a pending bankruptcy proceeding. 28 U.S.C. § 1334(b). We conclude, as have the relative handful of other courts of appeals that have addressed the question, that the Bankruptcy Rules control.

This conclusion has a domino effect and, when put into context, determines the outcome of this appeal. Under Bankruptcy Rule 9023, the plaintiffs' motion for reconsideration was late and, thus, did not stop the accrual of the appeal period. In the absence of tolling, the plaintiffs' ensuing notice of appeal was untimely and, therefore, their appeal must be dismissed for want of appellate jurisdiction. The tale follows.

**I**

We sketch the relevant facts and travel of the case. The plaintiffs who are appellants here, listed in Appendix A, brought thirty-nine separate suits against a number of defendants in the wake of a tragic derailment and explosion in Lac-Mégantic, Canada, which caused many deaths, extensive personal injuries, and large-scale property damage. For present purposes, it suffices to say that in June of 2013, a Canadian refinery arranged for a

transnational shipment of crude oil from North Dakota; a number of railroad companies participated in the shipment of the purchased oil across the midwestern United States and into Canada; responsibility for the rail cars in which the oil was transported was eventually assumed by Montreal, Maine and Atlantic Railway (MMA); and the derailment occurred on July 6, 2013 (on MMA's watch).[1]

MMA sought the protection of the bankruptcy court in the District of Maine. In and out of Maine, lawsuits proliferated. These civil actions were instituted in several different jurisdictions. The plaintiffs' wrongful death suits were filed in state courts in Illinois and Texas. In due course, they were removed to federal district courts, some pursuant to 28 U.S.C. § 1334(b) and some pursuant to 28 U.S.C. § 1332(a).

Defendant-appellee Canadian Pacific Railway Company (Canadian Pacific) was not among the defendants originally named in the plaintiffs' initial suits. The plaintiffs subsequently joined Canadian Pacific — allegedly a connecting carrier — as an additional defendant. Canadian Pacific has consistently

---

[1] The reader who desires further detail concerning the derailment and its horrific aftermath may consult earlier judicial opinions regarding various aspects of MMA's bankruptcy proceedings. See, e.g., In re Montreal, Me. & Atl. Ry., Ltd., 956 F.3d 1, 2-3 (1st Cir. 2020); In re Montreal Me. & Atl. Ry., Ltd., No. 13-10670, 2015 WL 3604335, at *1 (D. Me. Jun. 8, 2015); In re Montreal Me. & Atl. Ry., Ltd., 574 B.R. 381, 384-85 (Bankr. D. Me. 2017).

maintained that it was not properly served with process in these actions.

In February of 2016, the plaintiffs — along with MMA's trustee in bankruptcy — petitioned the United States District Court for the District of Maine for an order transferring the cases to that district pursuant to 28 U.S.C. § 157(b)(5), which allows a district court having jurisdiction over a bankruptcy proceeding to order the transfer to it of any "personal injury tort and wrongful death claims" related to the bankruptcy proceeding. The court below concluded that transfer was appropriate and later centralized all of the plaintiffs' suits in the District of Maine. The court then created an omnibus docket captioned "In Re Lac-Mégantic Train Derailment Litigation," which became an umbrella docket for a wide swath of third-party claims (including the plaintiffs' suits).

After further jousting (not relevant here), the plaintiffs sought dismissal of their claims against all of the named defendants except Canadian Pacific. The district court granted this request pursuant to a settlement agreement that was part of MMA's plan of liquidation, which the district court had confirmed on November 18, 2015. See In re Montreal Me. & Atl. Ry., Ltd., No. 1:15-mc-329, 2015 WL 7302223 (D. Me. Nov. 18, 2015); see also In re Montreal Me. & Atl. Ry., Ltd., Bk. No. 13-10670, 2015 WL 7431192 (Bankr. D. Me. Oct. 9, 2015) (recommending approval

of plan of liquidation).  This left Canadian Pacific as the lone defendant in the plaintiffs' suits.

Canadian Pacific moved to dismiss the plaintiffs' consolidated complaint, asserting (among other things) lack of in personam jurisdiction, insufficient service of process, and forum non conveniens.  The plaintiffs countered by moving for leave to file a second amended complaint, see Fed. R. Civ. P. 15(a), in which they sought to add as defendants several Canadian Pacific subsidiaries based in the United States, including Soo Line Railroad Company (Soo Line).  On September 28, 2016, the district court granted Canadian Pacific's motion to dismiss on jurisdictional grounds and denied the plaintiffs' motion to amend. The court denied all other pending motions as moot and entered final judgment in favor of Canadian Pacific.

On October 26, 2016 — twenty-eight days after the district court entered final judgment for Canadian Pacific — the plaintiffs moved for reconsideration in the district court of the denial of their motion to file an amended complaint.  See Fed. R. Civ. P. 59(e).  They annexed a proposed "Revised Second Amended Complaint" that sought, as relevant here, to substitute Soo Line for Canadian Pacific as the party defendant.  Canadian Pacific opposed the motion on a number of grounds, including timeliness. With respect to that ground, it argued that the Bankruptcy Rules controlled and that, therefore, the motion for reconsideration

- 6 -

came too late.  See Fed. R. Bank. P. 9023 (allowing a fourteen-day window for motions for reconsideration).  In a margin order, the district court summarily denied reconsideration.

On January 19, 2017, the plaintiffs filed this notice of appeal, purporting to challenge the denial of the motion for leave to amend.  Roughly three months later, Canadian Pacific filed a motion for summary disposition under First Circuit Local Rule 27(c), arguing that the plaintiffs' untimely motion for reconsideration lacked tolling effect and, thus, rendered the appeal untimely.  The plaintiffs opposed this motion.  On February 6, 2019, we denied the motion and set a briefing schedule.  Oral arguments were heard on March 3, 2021.

**II**

In this venue, the plaintiffs argue that we have appellate jurisdiction and maintain that the district court abused its discretion when it denied their motion for leave to amend the complaint.  Canadian Pacific, though, continues to press a threshold issue:  it contends that we lack appellate jurisdiction because the plaintiffs' notice of appeal was untimely.  This contention is premised on two interlocking assertions.  To begin, Canadian Pacific asserts that the plaintiffs' motion for reconsideration, which was made outside the fourteen-day window prescribed by the Bankruptcy Rules for such motions, see Fed. R. Bank. P. 9023, did not toll the running of the appeal period, see

Fed. R. App. P. 4(a) (specifying that in civil cases not involving the United States, notices of appeal must be filed within thirty days after the entry of judgment). Building on this foundation, Canadian Pacific asserts that the plaintiffs' notice of appeal, which was filed more than three months after the entry of final judgment and which did not enjoy the benefit of tolling, was untimely. We agree that the plaintiffs are unable to cross this threshold and, thus, our inquiry stops there.

We need not tarry. Federal courts are courts of limited jurisdiction and, in the absence of jurisdiction, a federal court is "powerless to act." Am. Fiber & Finishing, Inc. v. Tyco Healthcare Grp., 362 F.3d 136, 138 (1st Cir. 2004). It follows that we must rigorously patrol the boundaries of our appellate jurisdiction. See Commonwealth Sch., Inc. v. Commonwealth Acad. Holdings LLC, 994 F.3d 77, 82 (1st Cir. 2021); Whitfield v. Mun. of Fajardo, 564 F.3d 40, 44 (1st Cir. 2009). If we find jurisdiction lacking, that is the end of the matter.

Here, the existence of appellate jurisdiction turns principally on the answer to the following question: do the Bankruptcy Rules or the Civil Rules govern the procedures in a case over which a federal court exercises section 1334(b) jurisdiction as one "related to" a pending bankruptcy proceeding? This question is outcome-determinative because even though the two sets of rules are congruent in many respects, they sometimes

differ. One such difference is crucial here: the Bankruptcy Rules only allow fourteen days for the filing of a motion to reconsider, see Fed. R. Bank. P. 9023, whereas the Civil Rules allow twenty-eight days for that purpose, see Fed. R. Civ. P. 59(e). And under either set of rules, only a timely motion for reconsideration tolls the running of the appeal period. See Fed. R. Bank. P. 8002(b)(1)(B); Fed. R. App. P. 4(a)(4)(A)(iv); see also García-Velázquez v. Frito Lay Snacks Caribbean, 358 F.3d 6, 9 (1st Cir. 2004) ("An untimely motion for reconsideration . . . will not toll the running of the notice of appeal period."). The plaintiffs' motion to reconsider, filed on October 26, 2016, was timely if the Civil Rules controlled but untimely if the Bankruptcy Rules controlled.

To answer this dispositive question, we first review the bankruptcy system and certain historical developments that contributed to its current configuration. We then attempt to untangle the intertwined strands that encase the determination of which set of rules applies to "related to" cases pending in a federal district court.

**A**

Our starting point is Congress's passage of the Bankruptcy Reform Act of 1978 (BRA), which created the modern bankruptcy system. Prior to that date, federal district courts exercised plenary jurisdiction over all bankruptcy matters, with

the help of subalterns designated as referees in bankruptcy. See Bankruptcy Act of 1898, Pub. L. No. 55-541, §§ 2, 33, 30 Stat. 544, 545-46 (1898). These referees acted much as special masters and resolved bankruptcy matters subject to the district court's review. See id.

The BRA abolished the referee system and established in its place a federal bankruptcy court attached to each federal judicial district. The bankruptcy courts were Article I courts, endowed by Congress with jurisdiction to resolve matters "arising under title 11 or arising in or related to cases under title 11." 28 U.S.C. § 1471(b), (c) (repealed 1984). But this new system hit a speed bump in 1982: the Supreme Court concluded that Congress's efforts to endow Article I bankruptcy courts with the ability to adjudicate matters that were merely "related to" claims arising under title 11 violated Article III. See N. Pipeline Constr. Co. v. Marathon Pipe Line Co., 458 U.S. 50, 86-87 (1982); see also U.S. Const. art. III. The Court drew a distinction between cases arising under title 11 of the United States Code (which implicated rights of congressional creation) and "related to" cases (which often implicated claims arising under state law independent of title 11). See Marathon, 458 U.S. at 84-85. The latter group of cases, the Court reasoned, could not be resolved by Article I judges, who did not enjoy the protections embedded in Article III of the Constitution. See id. at 60.

In the last analysis, Marathon was a judicial repudiation of Congress's attempt to confer upon Article I courts broad jurisdiction over all cases loosely connected to title 11 claims. Aware that its decision would lead to the dismantling of the recently created bankruptcy system, the Court stayed its judgment for several months so that Congress could pick up the pieces. See id. at 88. The stay expired without agreement on how to reconfigure the system in a post-Marathon world.

After several years in which federal district courts operated under makeshift rules,[2] Congress finally passed the Bankruptcy Amendments and Federal Judgeship Act of 1984 (BAFJA). See Pub. L. No. 98-353, 98 Stat. 333 (1984). Among other things, BAFJA sought to ameliorate the jurisdictional infirmities pinpointed by the Marathon Court. Under the aegis of the new statute, district courts (not bankruptcy courts) could exercise jurisdiction over both bankruptcy cases arising under title 11 and those "related to" title 11 cases. 28 U.S.C. § 1334. Withal, a

---

[2] The Judicial Conference of the United States proposed the model emergency rule, in anticipation of the stay's expiration, in September of 1982. See Report of the Proceedings of the Judicial Conference of the United States, 91 (Sept. 22-23, 1982). Each federal district court proceeded to adopt its own version of the model rule, as a placeholder. For a full discussion of this history, the interested reader may consult Lawrence P. King, The Unmaking of a Bankruptcy Court: Aftermath of Northern Pipeline v. Marathon, 40 Wash. & Lee L. Rev. 99, 115-16 (1983).

district court could refer any such case to a bankruptcy court if it so elected.  See 28 U.S.C. § 157(a).

In line with 28 U.S.C. § 1334[3] and the teachings of Marathon, the procedures governing the new system distinguish between "core" and "non-core" cases and identify different final decisionmakers for each.  28 U.S.C. § 157(b)-(c).  With respect to core cases (that is, those cases arising under title 11), bankruptcy courts may issue final orders.  See id. § 157(b)(1). But with respect to non-core cases (that is, those cases "related to" core cases), a bankruptcy court may do no more than submit proposed findings of fact and conclusions of law to the district court, subject to de novo review.  See id. § 157(c)(1).

It is beyond cavil that, in enacting BAFJA, Congress carefully distinguished between core and non-core cases to address the jurisdictional concerns that the Marathon Court had identified.  That distinction informs our determination of which set of procedural rules — the Bankruptcy Rules or the Civil Rules

---

[3] Section 1334 declares that federal district courts have "original and exclusive jurisdiction of all cases under title 11" as well as "original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11."  28 U.S.C. § 1334(a)-(b).  Although section 1334 delineates two different categories of cases for jurisdictional purposes, it does not employ the core/non-core taxonomy found in section 157.  See text infra.  Even so, that taxonomy has become entrenched in federal law: cases arising under title 11 are core cases and "related to" cases are non-core cases. See, e.g., Stern v. Marshall, 564 U.S. 462, 474-77 (2011); Gupta v. Quincy Med. Ctr., 858 F.3d 657, 662 n.5 (1st Cir. 2017).

— governs the adjudication of a non-core, "related to" case in a federal district court.

Precedent favors the Bankruptcy Rules: all three of the courts of appeals to have considered the issue have concluded that the Bankruptcy Rules apply to a non-core, "related to" case pending in a federal forum. See In re Celotex Corp., 124 F.3d 619, 629 (4th Cir. 1997) (holding that "[t]he entire body of Bankruptcy Rules . . . applies to" such cases); Phar-Mor, Inc. v. Coopers & Lybrand, 22 F.3d 1228, 1238 (3d Cir. 1994) (holding that "Bankruptcy Rules govern non-core, 'related to' proceedings before a district court"); Diamond Mortg. Corp. of Ill. v. Sugar, 913 F.2d 1233, 1243 (7th Cir. 1990) (concluding that "nothing in the literal terms of the pertinent [Bankruptcy] rules . . . even remotely suggests that they are to be applied differently in core and non-core proceedings"); cf. Double Eagle Energy Servs., L.L.C. v. MarkWest Utica EMG, L.L.C., 936 F.3d 260, 264 (5th Cir. 2019) (finding Bankruptcy Rule 7004 applicable to "related to" case arising under state law). The leading treatise in the bankruptcy field also endorses this view. See 9 Collier on Bankruptcy ¶ 1001.01 (16th ed. 2016) (stating that both in the district court and the bankruptcy court, Bankruptcy Rules apply to "proceedings arising in or related to [core] cases"). It is against the backdrop of this emerging consensus that we turn to the question at hand.

- 13 -

We look first to the Bankruptcy Rules themselves — as we do in the case of any rules promulgated pursuant to a statute — for guidance in ascertaining the scope of their applicability. See United States v. Bauzó-Santiago, 867 F.3d 13, 18 (1st Cir. 2017). By their own terms, the Bankruptcy Rules "govern procedure in cases under title 11 of the United States Code." Fed. R. Bank. P. 1001. The question, then, is whether non-core, "related to" cases — like the plaintiffs' suits — are deemed to be cases under title 11.

Read in isolation, the language of Rule 1001 is not dispositive of this question. The phrase "under title 11 of the United States Code" does not precisely mirror the definition of core and non-core cases found in 28 U.S.C. § 157, and the phrase itself — standing alone — does not compel either a broad or a narrow reading. Section 157 describes core cases as those "arising under title 11," yet Rule 1001 omits the word "arising." It is difficult to say whether this omission was meant to signal a distinction or was merely a product of inartful drafting.

We think it important that this version of Rule 1001 was adopted in 1987 — well after Congress enacted BAFJA. Thus, the drafters of the rule must have been aware of the core/non-core dichotomy that Congress created. Had the drafters wished to restrict the applicability of the Bankruptcy Rules to core cases

alone, they simply could have used section 157's definition of core cases. The fact that the drafters took a different tack suggests that the language employed should be read more broadly. Cf. Ross v. Blake, 136 S. Ct. 1850, 1858 (2016) ("When Congress amends legislation, courts must 'presume it intends [the change] to have real and substantial effect.'" (quoting Stone v. INS, 514 U.S. 386, 397 (1995))).

Further support for a broad reading of Rule 1001 and the phrase "under title 11" is found in section 157 itself. The statutory text provides that "[b]ankruptcy judges may hear and determine all cases under title 11 and all core proceedings arising under title 11 . . . ." 28 U.S.C. § 157(b)(1). This language suggests that Congress envisioned a difference between "cases under title 11" and core cases. Such a conclusion follows from the venerable principle that, whenever possible, courts should construe statutes to give meaning to each word or phrase. See Gustafson v. Alloyd Co., 513 U.S. 561, 574 (1995); Akebia Therapeutics, Inc. v. Azar, 976 F.3d 86, 94 (1st Cir. 2020). Applying this principle, the fact that "cases under title 11" appears in addition to core cases "arising under title 11" lends credence to the view that these are two distinct (albeit overlapping) categories of cases. If both phrases were intended to define the same universe of cases, there would have been no point in Congress using two phrases and joining them with a

conjunction. And although this juxtaposition does not compel a conclusion that non-core, "related to" cases fall within the "under title 11" taxonomy employed by the drafters of the Bankruptcy Rules, it surely leaves that door wide open. See Phar-Mor, 22 F.3d at 1237 n.14 (explaining that, even though this phraseology does not "clearly encompass[] 'related to' cases, . . . it does not foreclose the possibility").

While our analysis to this point strongly suggests that the procedural aspects of non-core, "related to" cases adjudicated in federal district courts are governed by the Bankruptcy Rules, the sockdolager is found in the practicalities attendant to the efficient operation of the modern bankruptcy system. If the Civil Rules applied to non-core cases, a district court adjudicating both core and non-core cases in any given bankruptcy proceeding would need to apply two different sets of rules simultaneously. This anomaly would persist despite the fact that those cases likely would involve some of the same parties. So, too, a district court, reviewing a bankruptcy court's proposed findings of fact and conclusions of law in a non-core case, see 28 U.S.C. § 157(c)(1), would be bound to apply the Civil Rules after the bankruptcy court already had applied the Bankruptcy Rules. This curious twist would render nugatory Bankruptcy Rule 9033(d), which directs the district court to conduct de novo review of a bankruptcy court's findings and conclusions. Such a convoluted procedural scheme

would be in marked tension with the bankruptcy system's goal of resolving claims efficiently. See 98th Cong. Rec. S7620 (daily ed. Jun. 19, 1984) (statement of Sen. Dennis DeConcini) (explaining that proposed legislation sought "to balance effective bankruptcy administration with the constitutional concerns reflected in the Marathon decision"); see also Report of the Commission on the Bankruptcy Laws of the United States, 93d Cong. H.R. Doc. No. 93-137, pt. I, 2-5 (July 1973).

With such anomalies in mind, at least two of our sister circuits have explicitly warned against the procedural hybrid that would result from applying the Civil Rules to non-core, "related to" cases in federal district courts. See Phar-Mor, 22 F.3d at 1236-37; Diamond Mortg., 913 F.2d at 1243. As Judge Becker observed, such a hybrid would be "incompatible with the efficient disposition of bankruptcy cases," which was "the animating policy underlying the BAFJA." Phar-Mor, 22 F.3d at 1237. Similarly, Judge Cudahy noted that it would be "anomalous" for different rules to govern claims in the same court, given "the bankruptcy scheme's emphasis on centralization and efficiency." Diamond Mortg., 913 F.2d at 1243. We, too, think it implausible that Congress could have intended to create such a Rube-Goldberg-like adjudicative contraption. We cannot imagine any reason why Congress would authorize jurisdiction for core and non-core cases in the same judicial district, see 28 U.S.C. 1334(b), but require the district

court to apply a different set of rules to each. Such a step would be at cross-purposes with the drafter's admonition that the Bankruptcy Rules "shall be construed . . . to secure the just, speedy, and inexpensive determination of every case and proceeding." Fed. R. Bank. P. 1001.

This view is reinforced by the fact that the very existence of "related to" jurisdiction speaks to the efficiency goals of the bankruptcy system. "Related to" jurisdiction is designed to put everything in the same place and, thus, facilitates the efficient disposition of claims. See In re G.S.F. Corp., 938 F.2d 1467, 1475 (1st Cir. 1991) (explaining that a case is "related to" a bankruptcy proceeding if its resolution "could conceivably have any effect on the estate being administered in bankruptcy") (emphasis supplied) (internal quotation omitted). It seems obvious to us that the best way to effectuate this goal is for "both the bankruptcy judges and the district court judges [to] apply the same set of procedural rules in all proceedings having a nexus to a bankruptcy case." Phar-Mor, 22 F.3d at 1237.

That Congress took great care to preserve uniformity and efficiency in other areas of the Bankruptcy Rules is consistent with our appraisal of Congress's overarching goal. In Diamond Mortgage, for example, the court considered whether a particular service-of-process requirement in the Bankruptcy Rules applied to a non-core, "related to" case. See 913 F.2d at 1242-43. The court

concluded that creating mismatched procedural rules for core and non-core cases would serve only to frustrate BAFJA's objective of simplifying the bankruptcy system. See id. at 1243. The court found it telling that the drafters of the Bankruptcy Rules have made no effort to distinguish between core and non-core cases with respect to the service-of-process requirement. See id.

Similar reasoning can be applied to the facts at hand. Just as the drafters of the Bankruptcy Rules made no explicit distinction between core and non-core cases in formulating the service-of-process rule, they made no such distinction in formulating Rule 1001. And here — as in the Diamond Mortgage scenario — the drafters were aware of BAFJA's core/non-core distinction but eschewed that distinction when drafting Rule 1001.

We also recognize that 28 U.S.C. § 2075, which empowers Congress to authorize bankruptcy rules proposed by the judiciary, places primacy in the United States Code. Accordingly, any conflict between a statutory provision and the Bankruptcy Rules would have to be resolved in favor of the former.[4] See 9 Collier on Bankruptcy ¶ 1001.01 ("In the event of inconsistency between the statute and the rules, the statute controls."). Here, however,

---

[4] This hierarchy does not have deep historical roots. Prior to 1978, the statute provided that "[a]ll laws in conflict with such rules shall be of no further force or effect after such rules have taken effect." 28 U.S.C. § 2075 (1964). But Congress amended the statute in 1978, deleting that sentence. See 28 U.S.C. § 2075 (1978).

- 19 -

we see no conflict between BAFJA and a broad construction of Rule 1001.

The plaintiffs have a fallback position. They strive to persuade us that a district court, presiding over a non-core, "related to" case, may choose to apply either the Civil Rules or the Bankruptcy Rules. We are not convinced: such a pick-and-choose approach cannot be gleaned from the statutory text, the Bankruptcy Rules, the Civil Rules, or any combination of those sources. To cinch the matter, the plaintiffs' position finds no purchase in the case law.

We begin by noting that the plaintiffs' argument is incompatible with the text of the Civil Rules. Congress expressly provided that the Civil Rules only apply to bankruptcy cases "to the extent provided by the [Bankruptcy Rules]." Fed. R. Civ. P. 81(a)(2). This provision would make no sense if the plaintiffs' expansive notion of the district court's discretion was correct, and the canons of statutory interpretation do not favor constructions that reduce words or phrases within a statute to mere gibberish. See Nat'l Ass'n of Mfrs. v. Dep't of Def., 138 S. Ct. 617, 632 (2018) (explaining that "the Court is 'obliged to give effect, if possible, to every word Congress used'" (quoting Reiter v. Sonotone Corp., 442 U.S. 330, 339 (1979))).

What is more, nothing in either section 157 or Rule 1001 indicates that a district court has any discretion as to which set

of rules applies in a given case. If district courts were to be accorded this considerable latitude, we think that either Congress or the drafters of the Bankruptcy Rules would have said as much. Read naturally, section 157 instructs that the Civil Rules stop where the Bankruptcy Rules begin — a proposition that is antithetic to the plaintiffs' pick-and-choose approach.

We add, moreover, that the plaintiffs misconstrue the case law that they cobble together in support of the pick-and-choose approach. Contrary to the plaintiffs' representation, Diamond Mortgage says nothing about discretion: that case merely holds that if a court determines that the Bankruptcy Rules apply, it then "must determine the proper procedures to be followed in the case." 913 F.2d at 1241. The court's statement that district courts "may apply the Bankruptcy Rules in appropriate cases," id., is not a commentary on the exercise of discretion in a particular case but, rather, an affirmation that Congress, by enacting BAFJA, enabled district courts to hear bankruptcy cases and apply the Bankruptcy Rules.[5]

---

[5] The plaintiffs' efforts to siphon out particular language from other cases is no more helpful. None of those cases, see Rosenberg v. DVI Receivables XIV, LLC, 818 F.3d 1283 (11th Cir. 2016); Phar-Mor, 22 F.3d 1228, stands for the proposition that district courts have discretion to pick and choose whether to apply the Civil Rules or the Bankruptcy Rules in non-core, "related to" cases.

Laboring to turn dross into gold, the plaintiffs note that the court below alluded to the Civil Rules on several occasions. That is true as far as it goes — but it does not take the plaintiffs very far. The Bankruptcy Rules incorporate many of the Civil Rules, see, e.g., Fed. R. Bank. P. 7002, and the plaintiffs have not pointed to any occasion when the court below purposed to address the question of which set of rules applied to the matters before it. And while greater clarity on the part of district courts is always to be applauded, a lack of clarity on the district court's part does not vitiate our obligation to determine which set of rules applies in this case.

In a variation on this theme, the plaintiffs try to spin this lack of clarity as unfairly sandbagging them. They suggest that they had no notice that the Bankruptcy Rules were controlling. On this record, there is no room for an equitable exception to the quintessentially legal determination of which set of rules applies to a particular case. Cf. Bowles v. Russell, 551 U.S. 205, 214 (2007) (holding that federal courts have "no authority to create equitable exceptions to jurisdictional requirements" such as the "timely filing of a notice of appeal").

Here, moreover, the plaintiffs' notice-based concerns ring hollow. After all, the plaintiffs joined in the request to transfer their cases from other federal courts to the District of Maine as cases "related to" a pending bankruptcy proceeding within

the purview of 28 U.S.C. § 157(b).[6]  At that time, the existing case law, though sparse, put them squarely on notice that the Bankruptcy Rules would apply.  See Celotex, 124 F.3d at 629; Phar-Mor, 22 F.3d at 1238; Diamond Mortg., 913 F.2d at 1241.  And the leading treatise on bankruptcy law reinforced this conclusion.  See 9 Collier on Bankruptcy, ¶ 1001.01 ("Scope of Rule 1001").  Given this legal landscape, the plaintiffs scarcely can be heard to complain that they were not on notice that the Bankruptcy Rules likely would apply to the transferred cases.

We need go no further.[7]  The text of the Bankruptcy Rules, read in conjunction with Congress's redesign of the bankruptcy system in 1984, makes pellucid that the Bankruptcy Rules apply to non-core, "related to" cases adjudicated in federal district courts under section 1334(b)'s "related to" jurisdiction.  We so hold.  To rule otherwise would not only create a split in the circuits and leave district courts in a procedural labyrinth

---

[6] Indeed, many of the plaintiffs' suits originally had been removed from state courts to federal district courts under the auspices of 28 U.S.C. § 1334(b).

[7] To be sure, it might be open to the plaintiffs to argue that even if their appeal is untimely with respect to the denial of their motion to amend, it is nonetheless timely with respect to the denial of their motion for reconsideration.  See Air Line Pilots Ass'n v. Precision Valley Aviation, Inc., 26 F.3d 220, 223-24 (1st Cir. 1994).  Before us, however, they have not made that argument, so it is waived.  See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).

but also would severely undermine Congress's efficiency-oriented goals.

## III

Our holding that the Bankruptcy Rules govern the procedural aspects of this case ends the matter.[8]  On these facts, Bankruptcy Rule 9023 demands a finding that the plaintiffs' motion to reconsider was untimely and, therefore, the deadline for filing a notice of appeal expired thirty days after the district court entered final judgment on September 28, 2016.  See Fed. R. App. P. 4(a).  Consequently, the plaintiffs' attempted appeal is untimely and must be dismissed for want of appellate jurisdiction.  All parties shall bear their own costs.


**So Ordered**.

---

[8] Although the parties have briefed and argued other issues pertaining both to jurisdiction and to the merits, our holding makes it unnecessary to address them.  See, e.g., Vaquería Tres Monjitas, Inc. v. Comas-Pagán, 772 F.3d 956, 960 (1st Cir. 2014); Deniz v. Mun. of Guaynabo, 285 F.3d 142, 149-50 (1st Cir. 2002).

## Appendix A

### <u>Roster of Plaintiffs-Appellants</u>

Annick Roy, as special administrator of the estate of Jean-Guy Veilleux, deceased, individually and as next friend of minor, F.R.V.; Samuel Audet; Beland Audet; Emanuel Baillargeon; Sandra Baillargeon; Jean Boyle Barrett Beaudoin; Gabriel Beaudoin; Jocelyn Beaudoin; Raymond Beaudoin; Yves Bernier; Gerard Bolduc; Marie Claude Bouchard; Michel Bouchard; Suzie Bouchard; Pierrette Boucher Lafontaine; Rouville Boucher; Michel Boulanger; Daniel Boule; Pierre Boulet; Pierrette Boulet; Helene Bourgeois; Ghislain Champagne; Line Champagne; Denis Charest; Pascal Charest; Daniel Charrier; Sylvain Cote; Annette Doyon; Denise Dubois; Martial Dupiuis; Serge Faucher; Yves Faucher; Lea Favreau; France Fortier; Yannick Gagne; Daniel Gendron; Melanie Gerhard; Gravure Megantic; Mario Grimard; Group Exca Inc.; Nancy Guay; Eric Joubert; Jeannot Labrecque; Danielle Lachance; Lucille Lachance; Pierrette Lachance; Sylvie Lacroix; Angelique Lafontaine; Anna Lafontaine; Christian Lafontaine; Clement Lafontaine; Exca Lafontaine; Jonathan Lafontaine; Josie Lafontaine; Lisa Lafontaine; Luc Lafontaine; Marilou Lafontaine; Rosemary Lafontaine; Louise Lajeunesse; Guillaume Lapierre; Henriette Latulippe; Marcel Lavoie; Mayla; Marche Valiquette Ltee; Josee Morin; Clement Pepin; Yannick Pepin; France Picard; Louisette Picard; Mathieu Picard; Claude Plante; Manon Rodrigue; Doris Roy; Garage Jean Roy; Jean-Guy Roy; Ginette Roy; Julie Roy; Services Esthtiques Malya; Bernard St-Hilaire; Billy Turcotte; Celine Turcotte; Marc Vachon; Louise Valiquette; Philippe Valiquette; Rene Boutin; Sophie Boutin; Roxanne Boutin; Caroline Tremblay, individually and as representative of the estate of Guy Buldoc, deceased; as next friend of S.B., a minor; and as next friend of A-C.B., a minor; Jacques Bolduc; Solange Gaudreault; Mario Bolduc; Cynthia Boule, individually and as representative of the estate of Sylvie Charron, deceased; and as next friend of A.B., a minor; Jean-Guy Boule; Therese Pouliot, individually and as representative of the estate of Real Custeau, deceased; Simon Custeau, individually and as next friend of J.C., a minor; Sonia Pepin; Richard Custeau; Sylvie Custeau, individually and as representative of the estate of Suzanne Custeau, deceased; Michael Custeau; Karine Lafontaine; Rejean Custeau; Claude Turmel; Kathleen Bedard; Kim Turmel, individually and as next friend of A.L., a minor; as next friend of M.L., a minor; as next friend of L-A.N., a minor; and as next friend of E.N., a minor; Josee Bolduc; Vincent Nadeau; Guylaine St-Laurent, as representative of the estate of Natachat Gaudreau, deceased; Joanie Turmel; Chantal Gaudreau; Francois Poulin, individually and as representative of the estate of Lucie Vadnais,

deceased; Estel Blanchet; Sylvie Vadnais; Pauline Theberge; Elisabeth Vadnais; Diane Giroux Rodrigue, as representative of the estate of Jacques Giroux, deceased; Marie-Eve Poulin; Andre Giroux; Serge Morin, individually and as co-representative of the estate of Kaven Morin, deceased; Raymond Lapointe; Nancy Ducharme, individually and as co-representative of the estate of Kaven Morin, deceased; Joannie Lapointe; Kathleen Morin; Lucie Boutin; Michael Vallerand; Genevieve Breton; Ginette Dostie; Taxi Megantic ENR; Fiducie Familiale Francois Jacques, individually and on behalf of the estate of Dominik Leblanc; Societe de Gestion Jean-Pierre Jacques Inc.; Dube Equipment de Bureau Inc.; 9020-1468 Quebec Inc.; Via Beaute Sante ENR; Bolduc Chaussures LTE; Clinique Dentaire Marie-Pier Dube Inc.; Michel Charland; Societe En Commandite Projet Shier; Jean Vadnais; Isabelle Beaudry; Clermont Pepin, as special administrator of the estate of Eric Pepin-Lajeunesse, deceased; Pascal Lafontaine, as special administrator of the estate of Karine LaFontaine, deceased; Louise Couture; Mario Sevigny; Marc-Antoine Sevigny; Louise Breton; Ginette Cameron; Manon Bolduc; Sandy Bedard, as special administrator of the estate of Michel Guertin, Jr.; Herbert Ratsch, as special administrator of the estate of Willfried Heinz Ratsch, deceased; Genevieve Dube; Michelle Gaboury, as special administrator of the estate of Kevin Roy, deceased; Gaston Begnoche, as special administrator of the estate of Talitha Coumi Begnoche, deceased; Dave Lapierre; Marie-Eve Lapierre; Lisette Bolduc; Steve Bolduc; Maude Faucher; Karine Paquet; Guy Paquet, as special administrators of the estate of Roger Paquet, deceased; Jacques Martin; Solange Belanger, as special administrator of the estate of Jimmy Sirois, deceased; Guy Boulet; Elise Dubois-Couture, as special administrator of the estate of David LaCroix-Beaudoin, deceased; Lily Rodrigue; Rejean Roy, as special administrator of the estate of Mlissa Roy, deceased; Alexia Dumas-Chaput, as special administrator of the estate of Mathieu Pelletier, deceased; Theresa Poulan Dubois, as special administrator of the estate of Denise Dubois, deceased; Christiane Mercier, as special administrator of the estate of Marianne Poulin, deceased; Robert Picard; Justine Lapointe; Eric Bilodeau, as special administrator of the estate of Karine Champagne, deceased; Micheline Veilleux; Richard Turcotte, as special administrator of the estate of Elodie Turcotte, deceased; Marie-Josee Grimard, as special administrator of the estate of Henriette Latulippe, deceased; Alaine Bizier, individually and as representative of the estate of Diane Bizier, deceased; Steve Roy, individually and on behalf of minor Y.R.; Isabelle Boulanger, individually and as representative of the estate of Frederic Boutin, deceased; Colette Lacroix Boulet; Joanne Proteau, as special administrator of the estate of Maxime Dubois, deceased; Gabrielle Lapointe; Helen Lynn Barrett Beaudoin; Malya; Pierre

Picard; Boutique de la Gare Inc.